# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOSE CORPES,<br><br>       Plaintiff,<br><br>       v.<br><br>WALSH CONSTRUCTION COMPANY,<br><br>       Defendant. | No. 3:14-CV-181 (MPS) |

## MEMORANDUM OF DECISION

Christine Conran ("Conran" or "Plaintiff"), has sued Walsh Construction Company ("Walsh" or "Defendant"), alleging that Walsh discriminated against her in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.,* including the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d),[1] and the Connecticut Equal Pay Act ("CEPA"), Conn. Gen. Stat. § 31-75 *et seq.* (Amended Complaint (hereafter "Am. Compl."), ECF No. 59.) Walsh has moved to dismiss the Amended Complaint for failure to state a claim on which relief can be granted.[2] (ECF No. 61.)

---

[1] 29 U.S.C. § 206(d)(1) provides:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

[2] Conran filed her initial complaint on August 28, 2014. (*Conran v. Walsh Constr. Co.,* 3:14-cv-01251 (MPS), ECF No. 1.) Her case was consolidated with several others under *Corpes v. Walsh Constr. Co.,* 3:14-cv-181 (MPS) on October 15, 2014. (ECF No. 33.) Walsh filed a motion to dismiss Conran's complaint on January 20, 2015 (ECF No. 54), Conran filed an amended complaint on February 10, 2015 (ECF No. 59), and Walsh renewed its motion to dismiss on February 23, 2015. (ECF No. 61.)

For the reasons that follow, the Court DENIES Defendant's renewed motion to dismiss (ECF No. 61) and DENIES Plaintiff's motion for leave to file a sur-reply brief. (ECF No. 70.)

I.    **BACKGROUND**

Conran alleges the following facts, which are taken as true for the purposes of evaluating Walsh's motion to dismiss. Conran was hired by Aaron Tubbs ("Tubbs") with the approval of Don Gillis ("Gillis"), and began working for Walsh in New Haven, Connecticut, on August 31, 2011, as an Administrative Assistant or Cost Engineer Assistant for the Quinnipiac Bridge project. (Am. Compl. ¶ 7.) Her salary was $45,000 per year. (*Id.*) On March 5, 2012, regional supervisors Daniel Lucas ("Lucas") and David Casey ("Casey") promoted Conran to Project Administrator/Field Clerical at a salary of $46,000 per year. (*Id.* ¶ 8.) The promotion was approved by Rhonda Ceska, Director of Human Resources. (*Id.*) After her promotion, Conran reported to Ramkrishnan Karthik ("Karthik"), and her duties generally remained the same, including:

(a)  printing financial and work reports, such as cost reports and updates, daily and weekly production reports and weekly progress reports, and working with Excel spreadsheets to assist with such reports;

(b)  filing and data entry functions using programs to assist with financial reports, including submitting and coding invoices;

(c)  invoicing payment items to owners;

(d)  printing and filing contracts, subcontracts, purchase orders and change orders, and similar document control and data entry tasks, in connection with such documents, such as reviewing the documents for typographical errors;

(e)  working on monthly pay applications to satisfy subcontractor requisitions, assisting with the processing of subcontractor payment requisitions and checks issued, and quantity tracking in relation to subcontractors;

(f)  obtaining, reviewing and tracking lien waivers from subcontractors;

(g) working with state employees on Department of Transportation ("DOT") issues and/or required documentation, generating related reports for supervisors to issue to the DOT;

(h) working with the DOT on pay estimate reports and reviewing DOT payments for line items;

(i) maintaining and tracking revenue and job costs;

(j) interacting with subcontractors and vendors on day-to-day issues, such as with their documentation and requisitions;

(k) opening, recording and updating change orders;

(l) filing and data entry concerning payment or performance bonds and insurance certificates;

(m) data entry to set up a new job for cost reporting;

(n) tracking equipment rates for owned and leased equipment;

(o) establishing and/or maintain[ing] positive working relationships with clients/owners, subcontractors /suppliers, and the DOT; and

(p) assisting in the day-to-day operations of the Cost Management Group on Connecticut projects as needed.

(*Id.* ¶¶ 8-9.) Conran's employment ended on or about September 21, 2012. (*Id.* ¶ 8.)

Gary Fagan ("Fagan") began working as a Project Accountant for Walsh in Massachusetts on April 6, 2009, earning a salary of $70,000 per year. (*Id.* ¶ 11-12.) In February 2012, Tubbs, Steve Nannini and/or Paul Coogan transferred Fagan to Milford, Connecticut, to work on the Moses Wheeler Bridge project. Gillis approved the transfer. (*Id.* at ¶ 13.) After the transfer, Fagan, like Conran, reported to Karthik. (*Id.*) Lucas and Casey increased Fagan's salary to $71,400 per year on March 5, 2012, and Ceska approved the increase. (*Id.* ¶ 15.) Walsh terminated Fagan in July 2012.

Conran alleges that Fagan's duties changed when he transferred to Connecticut and that he became, like her, a Cost Engineer Assistant. (*Id.* ¶ 14.) Her Amended Complaint provides a

list of Fagan's job duties in Connecticut that is identical to those she lists for herself.[3] (*Id.* ¶ 16.)
When Fagan started working in Connecticut, Karthik instructed Conran to train Fagan on "DBE
reporting"[4] and on pay estimates for subcontractor work. (*Id.* ¶ 17.) Conran and Fagan assisted
one another, worked together, and communicated with each other multiple times per day while
they were both working in Connecticut. (*Id.*) Both of them required "Level 1 internet access" at
Walsh in order to complete their duties (*id.* at 18), and neither had a college degree in
Accounting. (*Id.* ¶ 19.) Karthik, the direct supervisor of both Conran and Fagan, trained them
"on substantially the same duties." (*Id.* ¶ 22.) Both Conran and Fagan performed work for
Karthik, and Karthik's supervisor, Tubbs. (*Id.*) In March 2012, "[Karthik] evaluated both Fagan
and Conran using substantially the same performance criteria and subparts for substantially equal
job duties." (*Id.* ¶ 23.) Walsh's Connecticut offices were "closely interconnected," Fagan
"frequently interchanged between both of Walsh's Connecticut locations in Milford and New
Haven," and "Fagan regularly worked at both the New Haven and Milford projects' offices each
week, including within the same office that Conran worked in New Haven, Connecticut." (*Id.* ¶¶
24-25.)

## II.   <u>STANDARD</u>

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,
accepted as true, to state a claim to relief that is plausible on its face. A claim has facial
plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable
inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S.

---

[3] The only difference between their duties, as listed in the Amended Complaint, is the addition of the
example "lien waivers" for Fagan in their shared duty (j), "interacting with subcontractors and vendors on
day-to-day issues, such as with their documentation, lien waivers, and requisitions."

[4] DBE is not defined in the parties' papers, but likely refers to the DOT's "Disadvantaged Business
Enterprise" program.

662, 678 (2009) (internal citation and quotation marks omitted). In evaluating a motion to

dismiss, the Court accepts as true all of the complaint's factual, non-conclusory allegations, *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and must "draw all reasonable inferences in

favor of the nonmoving party." *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*,

517 F.3d 104, 115 (2d Cir. 2008).

## III.  <u>DISCUSSION</u>

### A.  Additional Materials

Both parties attached, as exhibits, additional material outside of the pleadings, including

material obtained in discovery in a related case in which Conran is seeking overtime pay, *Alicen*

*Alicea, et al. v. Walsh Construction Company,* Civil Action No. 3:13-cv-00102 (MPS) (the

"related FLSA Action").[5] This material goes well beyond documents that are integral to or

incorporated in the complaint. It thus goes beyond what the Court may consider on a motion to

dismiss. Rule 12(d) of the Federal Rules of Civil Procedure provides that "[i]f, on a motion under

Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the

court, the motion must be treated as one for summary judgment under Rule 56" and "[a]ll parties

must be given a reasonable opportunity to present all the material that is pertinent to the motion."

Fed.R.Civ.P. 12(d).

Walsh argues that, rather than converting the motion into one for summary judgment, the

Court should take judicial notice of the additional materials. (Def.'s Br., ECF No. 54-1 at 3-4.)

Conran's brief zigzags on this point, accusing Walsh of "[i]ntroducing several exhibits outside

the pleadings" and "seek[ing] to decide this case on the merits before full discovery" (Pl.'s Opp.

Br. at 1), while at the same time submitting its own attachments "under the same notions"

---

[5] Conran states that no discovery has occurred in this Equal Pay Act case. (Pl.'s Opp. Br., ECF No. 66 at 12, 28.)

invoked by Walsh for asking the Court to review material outside the pleadings. (Pl.'s Opp. Br. at 18 n.11.) To the extent that the additional materials are filings in the related FLSA action, they are matters of public record, which may be considered on a motion to dismiss. *Byrd v. City of New York*, No. 04-1396-CV, 2005 WL 1349876, at *1 (2d Cir. June 8, 2005). The Court may not, however, take judicial notice of such documents "for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (internal citation omitted). Moreover "a plaintiff may not shore up a deficient complaint through extrinsic documents submitted in opposition to a defendant's motion to dismiss." *Goodfellow v. Allstate Indem. Co.*, No. 14-CV-642S, 2014 WL 7384239, at *1 (W.D.N.Y. Dec. 29, 2014); *see also Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998).

Here, through their attached exhibits, the parties attempt to introduce evidence that, as noted, goes beyond material that is incorporated in or integral to the complaint or of which the Court may take judicial notice. The materials include, for example, affidavits filed in the related FLSA action, pages from deposition transcripts, internal Walsh business documents such as personnel evaluations of Conran and Fagan, resumes of Conran and Fagan, and training documents. Nonetheless, Walsh presses the Court to consider all of this material in connection with the motion to dismiss, contending that "it would be unjust and a disservice to all parties to turn a blind eye to the affidavits filed by the plaintiff and Mr. Fagan in the FLSA Action," as well as other documents already in the parties' possession. (Def.'s Reply Br. at 3.) It is true, as Walsh suggests, that the primary purpose of Rule 12(d) is one of notice:

> A finding that plaintiff has had notice of documents used by defendant in a 12(b)(6) motion is significant since, as noted earlier, the problem that arises when a court reviews statements extraneous to a complaint generally is the lack of notice to the plaintiff that they may be so considered; it is for that reason—

> requiring notice so that the party against whom the motion dismiss is made may respond—that Rule 12(b)(6) motions are ordinarily converted into summary judgment motions. Where a plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.

*Cortec Indus., Inc. v. Sum Holding L.P.* 949 F.2d 42, 48 (2d Cir. 1991). It is also true that the dates of the materials the parties submitted, as well as the fact that some of them were filed previously in a related action, suggest that Conran had notice of at least some of them. The problem, however, is that the materials in question are not like the stock purchase agreement, offering memorandum, and warrant that were "integral to [the] complaint" in *Cortec Indus., Inc.,* 949 F.2d at 48. Such documents—like the actual agreement in a breach of contract case or a SEC filing in a securities case—typically refine and give detail to the more summary allegations of the complaint, and there is often no reasonable dispute about the meaning of such documents. In this case, by contrast, the wide range of evidence attached to the parties' briefs is not mentioned in the complaint and only complicates the question of whether Conran and Fagan had substantially equal duties. *See Global Network Commc'ns, Inc.,* 458 F.3d at 156-57 (district court erred in relying on materials such as witness testimony in granting motion to dismiss without converting motion to one for summary judgment because the testimony was not mentioned or otherwise integral to the complaint and content of testimony was not judicially noticeable). Further, the documents involved—including the deposition transcripts, training materials, resumes, and performance evaluations—are subject to interpretation and explanation in much the way summary judgment exhibits are. In short, this is the type of evidence that a court typically considers on summary judgment to determine whether there is a genuine dispute of material fact for trial. Here, however, Conran opposes the Court's converting this motion into a summary judgment motion on the ground that there has not been an opportunity to complete discovery.

(Pl.'s Br., ECF No. 66 at 18 n.11.) (Earlier, the parties jointly urged the Court to stay discovery

and the Court did so.) (ECF Nos. 56, 58.) Because it would be improper in this case to rule on

summary judgment before discovery is complete, the Court declines to convert the motion to one

for summary judgment, and, for the reasons stated above, also declines to consider the extrinsic

material.

### B.   "Substantially Equal" under the EPA and CEPA[6]

"The Equal Pay Act . . . prohibits employers from discriminating among employees on

the basis of sex by paying higher wages to employees of the opposite sex for 'equal work on jobs

the performance of which requires equal skill, effort, and responsibility, and which are

performed under similar working conditions.'" *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir.

1999) (quoting 29 U.S.C. § 206(d)(1)). "To prove a violation of the EPA, a plaintiff must first

establish a *prima facie* case of discrimination by showing: i) the employer pays different wages

to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal

skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions."

*Id.* (internal citations and quotation marks omitted).

> While the equal work inquiry does not demand evidence that a plaintiff's job is
> "identical" to a higher-paid position, the standard is nonetheless demanding,
> requiring evidence that the jobs compared are "substantially equal." To satisfy
> this standard, a plaintiff must establish that the jobs compared entail common
> duties or content, and do not simply overlap in titles or classifications.

*E.E.O.C. v. Port Auth. of New York & New Jersey*, 768 F.3d 247, 255 (2d Cir. 2014) (internal

citation omitted). "[W]hile a discrimination complaint need not allege facts establishing each

element of a prima facie case of discrimination to survive a motion to dismiss, it must at a

minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from

---

[6] The EPA and the CEPA are analyzed under the same standards. *See Fairchild v. Quinnipiac Univ.*, 16 F.
Supp. 3d 89, 96 (D. Conn. 2014).

conceivable to plausible." *Id.* at 254 (internal quotation marks and citations omitted). "At the pleading stage . . . a plausible EPA claim must include sufficient factual matter, accepted as true to permit the reasonable inference that the relevant employees' job *content* was substantially equal" in order "to provide fair notice [to the defendant] of the basis for [the plaintiff's] claims." *Id.* at 256 (internal citations and quotation marks omitted).

Walsh argues that Conran's EPA and CEPA claims fail because she has not alleged—and cannot allege—that Walsh paid her less than a male employee (Fagan) for "substantially equal" work under similar working conditions. (Def.'s Br., ECF No. 54-1 at 8.) Based on the allegations of the operative complaint, I disagree. First, there is no dispute that Walsh paid Conran less than Fagan. Second, the allegations of the Amended Complaint are sufficiently detailed and factual to make plausible an equal pay violation. Conran alleges that, after Fagan transferred to Connecticut, their duties became "virtually identical." (Am. Compl. ¶¶ 8-9, 16.) The only difference between their duties, as listed at length and with specificity in the Amended Complaint, is the addition of the example "lien waivers" for Fagan in their shared duty of "interacting with subcontractors and vendors on day-to-day issues, such as with their documentation, lien waivers, and requisitions." (*Id.* ¶ 16.) Both Conran and Fagan performed work for Karthik, and Karthik's supervisor, Tubbs. Karthik trained both of them "on substantially the same duties." (*Id.* ¶ 22.) Both had "Cost Engineer Assistant" positions while they were in Connecticut. (*Id.* ¶ 14.) Finally, Walsh evaluated both Conran and Fagan in March 2012 "using substantially the same performance criteria and subparts for substantially equal job duties." (Am. *Id.* ¶ 23.) Thus, the Amended Complaint includes sufficient factual matter to permit the reasonable inference that the job content of Fagan and Conran was substantially equal.

Walsh argues that "Fagan's position was meant to be responsible for the profit and loss of multiple construction sites," and that Conran "had no such responsibility." (Def.'s Br., ECF No. 54-1 at 11.) The fact that Fagan "was meant" to have different responsibilities is also inconsequential if, in fact, their actual responsibilities were the same. *See Port Auth. of New York & New Jersey*, 768 F.3d at 255. Walsh also argues that Fagan and Conran had different job titles; Fagan was a Project Accountant and Conran was an Administrative Assistant or Cost Engineer Assistant, and was later promoted to Project Administrator/Field Clerical. But if their positions required the same duties and involved the same content, then any differences in titles are immaterial. *Id*. Walsh also points to Fagan's resume and his past experience as providing reasons for his higher pay. (Def.'s Reply Br., ECF No. 68 at 2.) Plaintiff need only establish that the jobs had common duties or content, and Fagan's past employment experiences are not dispositive. *Port Auth. of New York & New Jersey*, 768 F.3d at 255. Finally, Walsh alleges that "Fagan's position required oversight and responsibility of Walsh's P&L statements, as well as the ability to analyze financial statements," while Conran's position did not. (Def.'s Br., ECF No. 54-1 at 11.) But even if Fagan's job originally required such responsibilities, it is not clear that Fagan retained such responsibilities when he transferred to Connecticut, and there is no mention of this in the Amended Complaint.

### C.  Same Establishment

Walsh argues that Conran and Fagan "never worked at the same establishment as required by the EPA." (Def.'s Br., ECF No. 54-1 at 13.) The EPA prohibits discrimination "within any establishment in which such employees are employed," 29 U.S.C. § 206(d)(1), and the EPA regulations define the word "establishment," as "refer[ring] to a distinct physical place of business rather than to an entire business or 'enterprise' which may include several separate

places of business. Accordingly, each physically separate place of business is ordinarily considered a separate establishment." 29 C.F.R. § 1620.9(a). Walsh's argument fails because Conran alleges that Walsh's Connecticut offices were "closely interconnected," that Fagan "frequently interchanged between both of Walsh's Connecticut locations in Milford and New Haven," and that "Fagan regularly worked at both the New Haven and Milford projects' offices each week, including within the same office that Conran worked in New Haven, Connecticut." (Am. Compl. ¶¶ 24-25.) Moreover, the same regulations state that:

> [U]nusual circumstances may call for two or more distinct physical portions of a business enterprise being treated as a single establishment. For example, a central administrative unit may hire all employees, set wages, and assign the location of employment; employees may frequently interchange work locations; and daily duties may be virtually identical and performed under similar working conditions.

29 C.F.R. § 1620.9(b). *But see Wetzel v. Liberty Mut. Ins. Co.,* 449 F. Supp. 397 (W.D. Pa. 1978) ("hold[ing] that . . . Liberty Mutual's approximately 130 branch offices do not constitute a single establishment because of the potential and actual range of duties in terms of skill, effort, responsibility and working conditions, that is among the physically separate branch offices."). Here, Conran alleges that substantially the same Walsh employees (Tubbs, Casey, Gillis, Lucas, and Ceska) hired both her and Fagan, set and adjusted their pay, and determined the location at which they worked. (Am. Compl. ¶¶ 7-8, 13-15, 24.) As discussed above, Conran alleges that Conran and Fagan's "daily duties in Connecticut were virtually identical and were performed under similar working conditions." (*Id.* ¶ 24; *see* ¶¶ 8-9, 16.) Thus, Conran has alleged facts sufficient to state a plausible claim that she and Fagan worked in the same establishment.

### D. Arguments Raised in Walsh's Reply Brief

Walsh makes several arguments for the first time in its reply brief, and Conran moves for leave to file a sur-reply brief to address those arguments. (ECF No. 70.) First, Walsh argues that, even assuming, *arguendo,* that Fagan was demoted to Cost Engineer Assistant when he

transferred to Connecticut in February 2012, the EPA permitted Walsh to continue paying Fagan his former salary under a salary retention policy. The EPA permits such a salary retention policy—called "red circling"—as a reason "other than sex" for maintaining different pay rates. (Def.'s Reply Br., ECF No. 68 at 4.) Second, Walsh argues that Conran's Amended Complaint is barred by the statutes of limitations of the EPA and the CEPA. (*Id*. at 6-7.) "Arguments may not be made for the first time in a reply brief." *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993). Here, Walsh has been on notice since August 28, 2014—when Conran filed her original complaint—that Conran alleged that Walsh paid her less than Fagan for equal work. Therefore, the Court disregards Walsh's new arguments at this stage, and denies Conran's motion for leave to file a sur-reply brief to address those arguments.

## IV.   **CONCLUSION**

For foregoing reasons, the Court DENIES Defendant's renewed motion to dismiss (ECF No. 61) and DENIES Plaintiff's motion for leave to file a sur-reply brief. (ECF No. 70.)

The stay of discovery is hereby lifted. The parties shall have 14 days to file a joint proposed case management plan addressing the time for discovery and any dispositive motions. If they cannot reach an agreement, they may file separate plans. Because the parties have already conducted substantial discovery in a related action, they must demonstrate good cause for any discovery period longer than 120 days.

IT IS SO ORDERED.

                                        /s/
                                        Michael P. Shea, U.S.D.J.


Dated:        Hartford, Connecticut
              September 14, 2015